**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANE DOE, individually and on behalf of all** | : | |
| **others similarly situated,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 23-3985** |
| | : | |
| **SAMSUNG ELECTRONICS AMERICA, INC.** | : | |
| **and SAMSUNG ELECTRONICS CO., LTD,** | : | |
| **Defendants.** | : | |

**Diamond, J.**                                                                                            **July 16, 2025**

<u>**MEMORANDUM OPINION**</u>

In this putative class action, Plaintiff seeks to evade mandatory arbitration by conflating arbitrable and non-arbitrable claims. The claims will be "unconflated" so that they can be heard in the appropriate forum.

As alleged, Jane Doe, the owner of a Samsung smartphone, was a victim of stalking facilitated by a "SmartTag" tracking device manufactured by Defendants Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd. (Doc. No. 1 ¶ 46.) She seeks to bring products liability claims against Samsung on behalf of similarly situated stalking victims and potential victims, including those who use non-Samsung products. (<u>Id.</u> ¶ 60.) Samsung bases its Motion to Compel Arbitration on the contractual requirement that its customers arbitrate any claim that "aris[es] out of or relat[es] in any way whatsoever to" the use of any Samsung product. (Doc. No. 51-1 at *3; Doc. No. 56 at 1; <u>see also</u> Doc. No. 43)

In vigorously opposing arbitration, Doe urges that the gravamen of her Complaint is the defective and dangerous conditions created by a SmartTag, which she never purchased or used. (Doc. No. 55 at 1-2.) Yet, she alleges that a predator was able to stalk her because Samsung's SmartThings app and the SmartThings Find feature that were installed on her Samsung Galaxy smartphone functioned defectively. (Doc. No. 1 ¶ 29.)

In these circumstances, it appears that a significant number of Doe's SmartTag-related claims—those based on the purported danger arising from the use of the Samsung SmartThings app, the SmartThings Find feature, and the Galaxy smartphone—must be arbitrated. Those claims based on the danger SmartTags create in conjunction with other devices—primarily Apple ("iOS") and non-Samsung Android devices—are not subject to a contractual arbitration requirement because there is no contract between those users and Samsung. Accordingly, I will grant Samsung's Motion in part. (Doc. No. 43.)

## I.    ALLEGATIONS

Ms. Doe's Complaint reads at points like a press release. She alleges (absent the heated prose) that in April 2022, her former boyfriend texted that he "had eyes on her," and knew her location. (Doc. No. 1 ¶ 47.) Suspecting that he had stalked her, Doe downloaded two applications, which third parties had designed to alert users to nearby tracking devices. (Id. ¶ 51.) The apps detected nothing. (Id.) In September 2022, Doe received another message from her former boyfriend that he knew her location. (Id. ¶ 52.) The police could not detect any trackers. (Id.) When Doe confronted her ex-boyfriend, he admitted that there was a SmartTag affixed to her car's bumper. (Id. ¶¶ 53-56.) After Doe asked Samsung Customer Service for assistance detecting any other tracking devices, a Samsung representative helped her activate SmartThings Find on her Samsung phone. (Id. ¶ 59; see also Doc. No. 51 at *3-4.)

A SmartTag is the size of a large coin and, when appended to objects such as keys, a bag, or a car, helps its user to locate those objects. (Doc. No. 1 ¶ 21.) SmartTags emit "Bluetooth" signals to any nearby Samsung device, which then reports the SmartTag's location to the SmartTag owner. (Id. ¶¶ 23-25.) Users access the locations of their SmartTags through the "SmartThings" app on their devices. (Id. ¶¶ 8, 9, 24-27.) Although Doe describes how SmartTags are used with

Samsung products, she also alleges that SmartTags are used with other devices, including Apple smartphones and Android products not manufactured by Samsung. (Id. ¶¶ 31-33.) As alleged, in the United States, there are hundreds of millions of devices that can relay a SmartTag signal. (Id. ¶¶ 8, 24.) Stalkers frequently use SmartTags, as they can easily be hidden among a victim's possessions, allowing the tracking of her location in "real time." (Id. ¶¶ 7, 11.)

As alleged, Samsung understood the dangers SmartTags could create. Three months after the SmartTag launch, the Company added a "SmartThings Find" feature to its SmartThings app. (Id. ¶ 28.) SmartThings Find is designed to "ensure nobody is secretly tracking" a user's location by revealing undiscovered SmartTags travelling with her. (Id. ¶ 28.) In Doe's view, this protection is not comprehensive, however. SmartThings Find functions only on Samsung devices and other devices running the Android operating system, but not on Apple products. (Id. ¶ 32.) Moreover, installation of only the latest version of the SmartThings app will enable it to work. (Id. ¶ 30.) Although SmartThings is pre-installed on Samsung devices, users of other Android devices must download the app. (Id. ¶¶ 30-31.) Even when SmartThings is downloaded, SmartThings Find provides no "passive" protection. (Id. ¶ 31.) Users must first activate the SmartThings Find feature within the SmartThings app, then initiate a scan to determine whether any unauthorized SmartTags have been detected. (Id.)

## II.    PROCEDURAL HISTORY

On October 16, 2023, Doe filed the instant Class Action Complaint pursuant to the Class Action Fairness Act on behalf of: a "Stalked Class" of all persons tracked without their consent by SmartTags; an "At-Risk-Of-Stalking" Class of all owners of an Apple or Android device; and a Multistate Sub-Class. 28 U.S.C. § 1332(d)(2)(A); (Doc. No. 1 ¶¶ 18, 60 ("[Doe brings] a class action in which some members of the Class are citizens of states different than Defendant.")). She

brings classwide claims of negligence, design defect, unjust enrichment, and intrusion upon seclusion. (Id. ¶¶ 65-89.) The matter was initially assigned to Judge Pratter (late of this Court), and then reassigned to me. (See Doc. No. 30.)

After I ordered Doe to disclose her real name to Samsung, the Company examined its own records and discovered that Doe was a longstanding Samsung customer: she opened a Samsung account in 2015 and purchased a Samsung Galaxy S21 smartphone in 2022. (Doc. No. 36, Doc. No. 43-1 at 1 n.1.) Samsung also learned that Doe had made several agreements with the Company. Doe assented to Samsung's Services Terms and Conditions both when she set up a Samsung account in 2015, and when she activated the SmartThings app on her phone in 2022 (to search for SmartTags). (Doc. No. 43-1 at 6-8.) When she bought and used her Galaxy S21 smartphone, Doe entered into two more contracts with Samsung: (1) the Galaxy S21 Terms and Conditions, and (2) the Galaxy S21 End User License Agreement. (Id. at 15-19.) As I discuss below, each of these contracts includes a mandatory arbitration provision. (Id. at 1.)

Doe urged that: 1) she assented to the Services Terms and Conditions in 2022 under duress because she had "activated and used [SmartThings] out of fear that her stalker would use SmartTags to track her location"; and 2) the arbitration clause in the Services Terms and Conditions was unconscionable. (Doc. No. 44 at 10-14.) She also contended that the Services Terms and Conditions—as well as the Galaxy S21 Terms and Conditions, and the End User License Agreement—were superseded by Samsung's 2024 Mobile Terms, which purported to be the "'full' and 'complete' agreement[s] that apply over 'any other applicable terms'" between the Company and its customers. (Id. at 16.) Samsung explained that it had not previously argued that the 2024 Mobile Terms controlled because "it did not know if Doe continued to use her SmartThings app

after August or September 2022," but that those Terms (if they applied to Doe) also obligated her to arbitrate her claims.  (Doc. No. 48 at 3-5.)

Armed with this new information, Samsung filed a Motion to Compel Arbitration, arguing, inter alia, that the contracts between Doe and the Company required her to arbitrate her claims. (Doc. No. 43.)  The Company urged me to decide its Motion under a Rule 12(b)(6) standard.  (Doc. No. 43-1 at 11.)  That standard applies, however, only "[w]here the . . . arbitrability of claims is apparent on the face of a complaint (or . . . documents relied upon in the complaint)."  <u>Guidotti v. Legal Helpers Debt Resol., L.L.C.</u>, 716 F.3d 764, 773-74 (3d Cir. 2013) (citation omitted). Because the arbitrability of Doe's claims was not facially apparent, I ordered limited discovery on the issue of arbitrability.  (Doc. No. 49.)

Once discovery was complete, the Parties filed a Joint Stipulation as to Arbitrability of Claims.  (Doc. No. 51.)  They agreed that: Doe acquired and activated a Galaxy S21 smartphone in early 2022, which came pre-loaded with the SmartThings app; Doe registered an account on the SmartThings app in August 2022 and used the app to search for SmartTags; in September 2022, Doe asked Samsung Customer Service for help using SmartThings Find to locate SmartTags; and because Doe had continued to use her Galaxy S21, the 2024 Mobile Terms govern the instant dispute as to arbitrability.  (<u>Id.</u> at *3-4.)  Doe abandoned duress and unconscionability contentions.  (<u>Id.</u> at *5.)  The Parties further stipulated that the arbitration clause in the 2024 Mobile Terms was "binding on both parties," "vali[d]," and "enforceabl[e]."  (<u>Id.</u> at *4.)  Finally, they agreed that "the sole issue for the Court is whether Doe's claims fall within the scope of the [arbitration clause] that is contained in the 2024 Mobile Terms."  (<u>Id.</u> at *5.)

I accepted the Parties' stipulated facts and allowed supplemental briefing on whether Doe was obligated to arbitrate her claims.  (Doc. No. 54.)  The matter is now fully briefed.  (Doc. Nos. 55-58.)

### III.    LEGAL STANDARDS

The Third Circuit has admonished that in determining arbitrability, if "the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue . . . . the issue should be judged under the Rule 56 standard."  Guidotti, 716 F.3d at 774; Fed. R. Civ. P. 56; (Doc. No. 49 at 1.)  Accordingly, if, after discovery, it is undisputed that the parties agreed to arbitration, the court should rule accordingly.  Young v. Experian Info. Sols., Inc., 119 F.4th 314, 317 n.4 (3d Cir. 2024).

### IV.    DISCUSSION

The Parties stipulate that Doe and Samsung formed a valid contract by entering into the 2024 Mobile Terms, and I agree.  (See Doc. No. 51 at *4-5.)  Those Terms compel Doe to arbitrate all her claims based on the operation of SmartThings, SmartThings Find, and her Galaxy phone. (See Doc. No. 51-1 at *2-3.)

#### A.  The 2024 Mobile Terms

The Terms include a set of four contracts: an End User License Agreement ("EULA"), a Dispute Resolution Agreement ("DRA"), a Standard Limited Warranty, and a separate Standard Limited Warranty for Repair Parts.  (Doc. No. 51-1 at *2-11.)  The Terms were last updated on February 5, 2024.  (Id. at *2.)

Both the EULA and DRA are binding on Doe.  EULA's first paragraph states that "[b]y using [any] Samsung Product . . . you accept the terms of this End User License Agreement

('EULA') . . . . If you do not accept the terms of this EULA, do not use the Product."  (Id. at *6.)

Because Doe continued to use her Galaxy S21 smartphone after the Mobile Terms were last

updated, she entered into the EULA.  (See Doc. No. 51 at *4.)  EULA incorporates the DRA by

reference.  (Doc. No. 51-1 at *10 ("This End User License Agreement includes a binding Dispute

Resolution  Agreement,  which  includes  an  arbitration  provision . . . [that]  is  incorporated

herein.").)  Doe has thus assented to the DRA as well.

The DRA was created pursuant to the Federal Arbitration Act.  (Doc. No. 51-1 at *6); 9

U.S.C.  §  1 et seq.  The Act provides that a "written provision in . . .  a contract evidencing a

transaction . . .  to settle by arbitration a controversy thereafter arising out of such contract or

transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law

or in equity for the revocation of any contract."  9 U.S.C.  § 2.  The FAA also iterates the

"fundamental  principle  that  arbitration  is  a  matter  of  contract."  AT&T  Mobility  LLC  v.

Concepcion, 563 U.S. 333, 339 (2011) (citation omitted).  I must thus look to state contract law to

determine the scope of an arbitration agreement.

> [I]n applying general state-law principles of contract interpretation to the interpretation of
> an arbitration agreement within the scope of the Act, due regard must be given to the federal
> policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself
> resolved in favor of arbitration.

Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475-76 (1989)

(citation omitted).

Under the EULA and DRA, I should apply New York law.  EULA's Section 17 provides

that both it and the DRA "shall be governed by and interpreted in accordance with the laws of the

State of New York, USA."  (Doc. No. 51-1 at *10.)  In diversity cases, federal courts "look to the

choice-of-law rules of the forum state—the state in which the District Court sits—in order to

decide which body of substantive law to apply to a contract provision, even where the contract

contains a choice-of-law clause." <u>Collins ex rel. Collins v. Mary Kay, Inc.</u>, 874 F.3d 176, 183 (3d Cir. 2017). "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." <u>Kruzits v. Okuma Mach. Tool, Inc.</u>, 40 F.3d 52, 55 (3d Cir. 1994). The Parties here agree that New York law applies. (Doc. No. 55 at 4-5; Doc. No. 56 at 4.) I agree as well.

The DRA provides that "a court of competent jurisdiction shall have exclusive jurisdiction over . . . [a]ny Dispute relating to the formation, scope, validity, and enforceability of this agreement." (Doc. No. 51-1 at *3.) When an individual dispute regarding Samsung Products cannot be resolved informally, the DRA:

> REQUIRES THE PARTIES TO RESOLVE DISPUTES . . . ONLY IN SMALL CLAIMS COURT OR THROUGH ARBITRATION ON AN INDIVIDUAL BASIS RATHER THAN THROUGH A JURY TRIAL OR CLASS ACTION.

(Doc. No. 51-1 at *2.) A "dispute" is defined as:

> [A]ny claim or controversy arising out of or relating in any way whatsoever to (i) the relationship between You and Samsung; (ii) the advertising, marketing, sale, condition, or performance of the Product; (iii) the Terms and Conditions relating to the Product—including, but not limited to, the End User License Agreement, Standard Limited Warranty, and privacy policies and notices and (iv) claims that are currently the subject of a purported class action in which You are not a member of a certified class. Dispute shall encompass any claim or controversy that arose before the Agreement or after termination.

(<u>Id.</u> at *3.) A "Product" is deemed:

> . . . to include both hardware and software on any Samsung branded device. This includes software, services, and applications that are created or distributed by Samsung ("Samsung Software") as well as any third-party software, services, and applications that are pre-loaded onto the Samsung-branded device.

(<u>Id.</u>)

### B.  *Scope of the Arbitration Agreement*

Samsung argues that Doe "agreed to arbitrate 'any claim or controversy arising out of or relating in any way whatsoever to . . . the advertising, marketing, sale, condition, or performance of' [her] Samsung Galaxy S21 smartphone . . . and the SmartThings app that came preinstalled." (Doc. No. 56 at 1.)  I agree.

Doe alleges that Samsung developed the SmartTag to work in tandem with the Company's Galaxy smartphone and the SmartThings app with its SmartThings Find feature—all designed to activate if someone is tracking the user.  (Doc. No. 1 ¶¶ 25-28.)  In Doe's view, however, that system is defective, providing virtually no protection from stalking: "[w]hile Samsung has built safeguards into the Samsung product, they are woefully inadequate, and do little, if anything, to promptly warn individuals if they are being tracked."  (Id. ¶ 29.)  Doe further alleges:

> The SmartThings Find feature does little to eliminate the dangers of stalking, as even Samsung users need to be acquainted with the SmartThings Find app, have the latest version installed, and need to actively scan themselves, with no proactive notification from the device or SmartThings app, that the individual may be tracked.  Individuals with Samsung phones will find that the SmartThings App comes pre-installed, however the individual needs to take steps to set up the SmartThings Find feature.

(Id. ¶ 30.)

Doe argues that her use of the Samsung products is of no moment because she "has never purchased, owned, or used a SmartTag."  (Doc. No. 55 at 1.)  This misses the point.  Doe bases as much as 40% of the claims she seeks to bring on her allegations that her use of the Galaxy phone, SmartThings app, and SmartThings Find, was dangerous because the products' defects did not reveal that she was being tracked.  (Doc. No. 1 ¶ 33.)  It is thus evident that these claims "aris[e] out of or relat[e] in any way whatsoever to" her use of the Samsung products.  Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 568 (2d Cir. 2011) ("The New York Court of Appeals has held that the phrase 'arising out of' is 'ordinarily understood to mean originating from, incident to, or

having connection with.'") (citation omitted); see also Black's Law Dictionary (12th ed. 2024) (defining "arise" as "[t]o originate; to stem (from)" or "[t]o result (from)").  Although "there are necessary limits to the reach of the phrase 'relates to,'" that language must be "interpreted broadly as its plain language indicates." Sasso v. Vachris, 484 N.E.2d 1359, 1361 (N.Y. 1985) (citations omitted) (in the insurance context); see also Oxford English Dictionary (online ed. 2025) (defining "relate" as "[t]o have some connection with; to stand in relation to").  Doe is thus contractually obligated to arbitrate those claims.

This conclusion is buttressed by the Supreme Court's holding that the FAA "embod[ies a] national policy favoring arbitration." AT&T Mobility LLC, 563 U.S. at 346 (citation omitted). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).  "Such a presumption is particularly applicable where the clause is . . . broad." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986).

Relying primarily on Davitashvili v. Grubhub, Inc., Does argues that her "use of a Samsung mobile device is mere happenstance and incidental, not central, to her claims." (Doc. No. 55 at 9); No. 20-3000, 2023 WL 2537777 (S.D.N.Y. Mar. 16, 2023), aff'd in part, 131 F.4th 109 (2d Cir. 2025).  This is simply wrong.  In Davitashvili, antitrust class members sought to allege, inter alia, that Grubhub's contract with various food vendors required those vendors to charge the Grubhub price to all other purchasers, regardless of whether they made their purchases through that platform.  131 F.4th at 114.  Grubhub noted that those plaintiffs had Grubhub account contracts requiring them to arbitrate individually any claim or dispute "that in any way relate[s] to your use of [Grubhub]," or "that may arise out of the interpretation or performance of [their Grubhub account contract]." Id. at 119.  The platform thus urged that those plaintiffs were contractually

required to arbitrate their antitrust claims.  Id.  The Second Circuit disagreed, ruling that those claims "have nothing to do with Plaintiffs' individualized use of Grubhub's website."  Id.

The instant products liability case is plainly different.  Here, Doe alleges that she was injured when the Samsung Products she purchased and used failed to function as designed. Because her use of those Products—and their attendant arbitration requirement—is thus "central" to her products claims, they must be individually arbitrated.  Doe may not evade that arbitration requirement by drowning those claims in a sea of claims that are not arbitrable because they have nothing to do with the purchase and use of Samsung Products.

The other decisions Doe offers against arbitration are also inapposite or otherwise distinguishable.  Cf. McFarlane v. Altice USA, Inc, 524 F. Supp. 3d 264 (S.D.N.Y. 2021) (plaintiffs' employment claims lack "nexus" to arbitration agreement they signed as customers of defendant); Wexler v. AT&T Corp., 211 F. Supp. 3d 500 (E.D.N.Y. 2016) (no arbitration agreement formed between plaintiff and AT&T Corp. after she contracted with AT&T Mobility, a separate company); Ireland-Gordy v. Tile, Inc., 760 F. Supp. 3d 946 (N.D. Cal. 2024) (arbitration agreement is unconscionable—a contention that Doe has abandoned).

Finally, as I have discussed, the majority of Doe's claims are unrelated to the purchase of Samsung Products by her or Class Members.  She alleges that "[u]sers of mobile devices running the Android operating system on a non-Samsung device" are in danger of being stalked.  (Doc. No. 1 ¶ 31.)  More significantly, as alleged:

> [I]ndividuals who own iPhones, iPads, or iPod Touches are more vulnerable to being tracked using a SmartTag.  iOS mobile devices have a 59.64% market share in the United States, meaning that over half of America's population would not receive any notification if they were being stalked by a SmartTag.

(Id. ¶ 33.)

These Class Members have here no contractual relationship with Samsung.  Their claims do not "aris[e] out of or relat[e] in any way whatsoever to" their use of Samsung Products.  (See Doc. No. 51-1 at *2.)  They are thus not bound by Samsung's 2024 Mobile Terms, the EULA, or the DRA.  The claims of these Class Members against Samsung relate solely to third parties' abuse of SmartTags, which the Class Members neither purchased nor used.  Accordingly, those claims are not subject to mandatory arbitration.  Volt Info. Scis., Inc., 489 U.S. at 478 ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so.").

## V.    CONCLUSION

Doe may not evade her contractual obligations by mingling claims she must arbitrate with claims to which that obligation does not attach.  Doe and those Class Members who base their claims on their purchase and use of Samsung Products governed by the 2024 Mobile Terms, the EULA, and the DRA are contractually obligated to arbitrate their claims against Samsung.  Those Class Members whose claims arise from purchase and use of Apple or other non-Samsung products are not required to arbitrate those claims.

Whether I should stay Doe's iOS and non-Samsung Android claims until the arbitration is concluded, and whether Doe can meet Rule 23's adequacy and typicality requirements will, presumably, be addressed in due course.  See Moses H. Cone, 460 U.S. at 21 n.23 ("In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration.   That decision is one left to the district court."); Amchem Prods., Inc.

v. Windsor, 521 U.S. 591, 613 (1997) ("Rule 23(a) states four threshold requirements applicable to all class actions: . . . (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')."). As requested by Samsung, I will stay those claims subject to mandatory arbitration. (Doc. No. 43-3.)

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.